OPINION OF THE COURT
James H. Ferreira, J.
This is a special proceeding pursuant to CPLR article 78 commenced by Verizon New York Inc., a New York corporation. Respondents are the New York State Public Service Commission, Kathleen H. Burgess, as Secretary to the Commission (the Secretary), the New York State Department of Public Service (DPS) and Donna M. Giliberto, as Records Access Officer (the RAO) for DPS. In this proceeding, petitioner seeks to: (1) overturn a final appeal determination by the Secretary, issued December 2, 2013, upholding a determination by the RAO that certain documents submitted by petitioner to respondents during the course of a regulatory proceeding were not exempt from disclosure as trade secrets or confidential commercial information pursuant to the Freedom of Information Law (see Public Officers Law art 6 [FOIL]); and (2) preclude respondents from publicly disclosing said documents in response to a FOIL request by third parties appearing in the underlying regulatoiy proceeding.
*861 The verified petition, affirmation in support and memorandum of law in support were filed December 16, 2013.[1] By order to show cause on consent, signed December 16, 2013 by the Honorable Thomas A. Breslin, J.S.C., respondents’ underlying determinations were stayed, and disclosure of the documents at issue by respondents to the public or to any third parties was barred pending a final determination of this proceeding and any appeal that may be commenced thereupon. The verified petition was returnable on March 14, 2014. A verified answer and memorandum of law were filed by respondents on February 26, 2014. By letter decision and order dated March 27, 2014, this court granted, in part, a motion brought by Richard Brodsky, Esq., on behalf of Communication Workers of America, District 1, Common Cause, Consumers Union and the Fire Island Association (the Brodsky group), for permission to appear in the proceeding as amici curiae.[2] The court also granted oral argument on the petition, and heard such argument on April 10, 2014.[3]
Procedural Background
Between May and September 2013, DPS staff issued a series of interrogatories and document production requests to petitioner as part of an underlying regulatory proceeding involving a tariff filing by petitioner.[4] In that tariff filing, petitioner sought to amend its tariff to allow it to discontinue its current wireline service offerings in the western portion of Fire Island, New York and offer, in the alternative, Verizon Voice Link (WL), a wireless service, as its sole service offering in the area.[5] Petitioner responded to the information requests by providing *862 DPS staff with written replies and exhibits (verified petition ¶ 17). Petitioner also submitted certain information to the RAO with a specific request, pursuant to Public Officers Law § 89 (5) (a) (1), that such information be treated by the Commission and DPS as “trade secret and confidential commercial information” pursuant to FOIL (affirmation in support, exhibit A, letters dated June 17, 2013, July 22, 2013, Aug. 15, 2013). Petitioner specifically sought an exemption from disclosure pursuant to Public Officers Law § 87 (2) (d) and 16 NYCRR 6-1.3 (see id.).[6]
On or about September 13, 2013, the Brodsky group submitted comments to the Commission in case 13-C-0197 (see id., exhibit B). These comments included objections to petitioner’s request for confidentiality and non-disclosure of certain information, and referenced its “assertion of [its] rights” under FOIL (id. at II).[7] By letter dated September 23, 2013, the RAO informed petitioner and the Brodsky group that the latter’s comments, insofar as its objections to petitioner’s confidentiality claims were concerned, would be treated as a request for the records under Public Officers Law § 87 and that access to the records would be determined in accordance with Public Officers Law § 89 (5) (see id., exhibit C). In addition, the RAO listed the various categories of information that the Brodsky group had sought to be disclosed under FOIL, including the information at issue in this proceeding: (1) information relating to actual costs incurred or projected to be incurred by petitioner in connection with providing wireline and wireless services on Fire Island; and (2) “[mjarketing and training materials used on Fire Island or elsewhere in New York relating to Voice Link service” (id.). Finally, the RAO informed petitioner that she would consider whether the information sought to be withheld by petitioner was exempt from disclosure, and permitted petitioner to submit a statement of necessity on that point under Public Officers Law § 89 (5) (b) (1) and (2) (see id.).
On October 4, 2013, petitioner submitted redacted versions of certain interrogatory responses per the RAO’s September 23, 2013 letter (see id., exhibit H). The information redacted falls *863 into two categories: cost and network information (cost information) and petitioner’s WL methods and procedures (M & P information) (see verified petition ¶ 26). The eight pages of cost information include “detailed costs for specific network components” (id. ¶ 29), and contain cost estimates, data and studies related to deploying the WL wireless services on a portion of Fire Island, as well as two alternative wireline networks known as Digital Loop Carrier (DLC) and Fiber to the Premises (FTTP) (see id. ¶ 28). The M & P information concerns 13 documents (331 pages in total[8]) used by petitioner in connection with offering WL.[9] Petitioner describes these documents as “scripts for call center representatives; training materials; and similar documents, all of which are intended to inform, instruct, and advise Verizon’s employees on various aspects of how they should interact with current and prospective WL customers” (id. ¶ 30).
On October 7, 2013, petitioner submitted a statement of necessity in accordance with the RAO’s request and Public Officers Law § 89 (5) (b) (2). Petitioner argued, among other things, that the cost information and M & P information are exempt from disclosure because they contain “non-public, competitively-sensitive information—including information related to Verizon’s network costs and its proprietary processes and procedures for marketing and administering a competitive product offering—and . . . disclosure . . . would create a windfall for Verizon’s competitors” (id. ¶ 24). On October 11, 2013, the Brodsky group submitted comments to the Secretary and the RAO opposing petitioner’s request to keep the information confidential. The Brodsky group argued that petitioner’s “windfall” argument was without merit and its proof of “substantial competitive injury” was insufficient, speculative and conclusory (affirmation in support, exhibit M). On October 24, 2013, Brodsky informed the RAO by email that he formally rejected the redacted copies submitted by petitioner as “insufficient and not fulfilling [his FOIL] request” (id., exhibit N).
*864 In a determination dated November 4, 2013, the RAO concluded that the cost information and the M & P information submitted by petitioner were not exempt from disclosure pursuant to Public Officers Law § 87 (2) (d). While the RAO found that the cost information and part of the M & P information (3 of the 13 documents) “fit[ ] within the definition of trade secret” (id., exhibit I at 12), she determined that petitioner “offered no factual support” to satisfy the second prong of a two-part test, namely that “disclosure would cause substantial injury to the competitive position of the subject enterprise” (id. at 13). Noting that petitioner had not “met the burden of proof it bears pursuant to [Public Officers Law] § 89 (5) (e)” and that “[m]ere conclusory allegations, without factual support, are insufficient to sustain non-disclosure,” the RAO found that “the information claimed by Verizon to be trade secrets or confidential commercial information does not warrant an exception from disclosure” (id. at 13, 15-16).[10]
On November 15, 2013, petitioner filed an appeal to the Secretary seeking reversal of that portion of the RAO’s determination which related to the cost information and M & P information (see id., exhibit O). Petitioner submitted with its appeal the declarations of: (1) Dr. William E. Taylor, an economist; (2) Robert Wheatley II, Verizon’s executive director of financial planning and analysis and a person with experience in pricing and finance; and (3) Thomas MacNabb, Verizon’s director of operations in the National Operations Organization and project director for VVL (see id., exhibits J, K, L). The Brodsky group submitted a letter, dated November 22, 2013, in support of the RAO’s determination, arguing, among other things, that the declarations were broad and conclusory and that the appeal failed to set forth any “specific and particularized justification for denying access” (id., exhibit P at 2).
On December 2, 2013, the Secretary issued a decision denying petitioner’s appeal and upholding the RAO’s decision in its entirety (appeal determination) {see id., exhibit Q). The Secretary concluded that “[u]nder FOIL case law, the burden is on Verizon to demonstrate particularized and specific justification, sup *865 ported by evidence, for denying access to the documents at issue and, inasmuch as Verizon has failed to meet its burden, I uphold the RAO’s November 4, 2013 Determination” (id. at 20). As for the cost information, the Secretary found that petitioner had failed to show how release under FOIL of the “cost information, both aggregate and specific, contained within those documents would result in substantial competitive injury” (id. at 13-14). The Secretary found the declarations of Taylor and Wheatley to be lacking in reasoning and specificity as to how the disclosure of the aggregate cost information could result in competitive injury.
As for the M & P information, the Secretary similarly found that the declaration of MacNabb contained only “conclusory allegations [of competitive injury] that lack factual support” (id. at 16). The Secretary concluded that there was neither “adequate detail” nor “specific evidence” as to how disclosure of the 13 documents would result in substantial competitive injury (id. at 16-17). The Secretary lamented the failure by petitioner to separate out the 13 documents and to “attempt to make an evidentiary showing on each” {id. at 17). Instead, according to the Secretary, petitioner “com[m]ingled internally published M & Ps with other documents and presentations . . . produced for similar purpose[s] (i.e. to provide training or to describe a proposed or actual internal operation or process), but not specifically identified as an ‘M & P’ ” (id.). The Secretary also rejected petitioner’s argument that the RAO had improperly overruled DPS agency precedent as to whether petitioner’s network costs were proprietary, and thus exempt from disclosure under the trade secret exemption (see id. at 18).
Petitioner thereafter commenced this proceeding seeking review of the Secretary’s determination. Petitioner argues, among other things, that the Secretary erred by holding that the cost information and the M & P information was not exempt from disclosure pursuant to Public Officers Law § 87 (2) (d), where the materials constitute trade secrets of a commercial enterprise that are not available from any other source. Petitioner urges that, contrary to the Secretary’s finding, Public Officers Law § 87 (2) (d) does not require a showing that the disclosure of trade secrets would cause substantial competitive injury and that, once the Secretary found such materials to be trade secrets, she was required to exempt them from disclosure without further inquiry. Petitioner argues that, nonetheless, it met its burden of showing that disclosure of the subject documents would cause substantial competitive injury if disclosed.
*866 Respondents argue in response that, under FOIL, Public Service Commission regulations and relevant case law, an entity resisting disclosure pursuant to Public Officers Law § 87 (2) (d) must demonstrate that the records at issue constitute trade secret material and that the disclosure of such would cause substantial competitive injury. Respondents further contend that the Secretary properly determined that petitioner had failed to meet its burden of proving that disclosure would result in substantial competitive injury.
Standard of Review
Where, as here, a petitioner challenges an administrative determination made where a hearing is not required, judicial review is limited to the issues of whether the challenged determination is rationally based, and whether it was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion (see CPLR 7803 [3]; Ward v City of Long Beach, 20 NY3d 1042, 1043 [2013]; Matter of Scherbyn v Wayne-Finger Lakes Bd. of Coop. Educ. Servs., 77 NY2d 753, 758 [1991]; Matter of Bais Sarah Sch. for Girls v New York State Educ. Dept., 99 AD3d 1148, 1150 [3d Dept 2012], lv denied 20 NY3d 857 [2013]). “[A] court may not substitute its judgment for that of the board or body it reviews unless the decision under review is arbitrary and unreasonable and constitutes an abuse of discretion” (Matter of Arrocha v Board of Educ. of City of N.Y., 93 NY2d 361, 363-364 [1999] [citations and internal quotation marks omitted]; see Matter of Boatman v New York State Dept. of Educ., 72 AD3d 1467, 1468 [3d Dept 2010]). Said another way, “[i]f the court finds that the determination is supported by a rational basis, it must sustain the determination even if the court concludes that it would have reached a different result than the one reached by the agency” (Matter of Peckham v Calogero, 12 NY3d 424, 431 [2009]; see Matter of Wooley v New York State Dept. of Correctional Servs., 15 NY3d 275, 280 [2010]).
In addition, it is well-settled that the “[interpretation given a statute by the agency charged with its enforcement is, as a general matter, given great weight and judicial deference, so long as the interpretation is neither irrational, unreasonable nor inconsistent with the governing statute” (Matter of Trump-Equitable Fifth Ave. Co. v Gliedman, 62 NY2d 539, 545 [1984]; see Matter of Brooklyn Assembly Halls of Jehovah’s Witnesses, Inc. v Department of Envtl. Protection of City of N.Y, 11 NY3d 327, 334 [2008]; Matter of County of Albany v Hudson Riv. *867 Black Riv. Regulating Dist., 97 AD3d 61, 68 [3d Dept 2012], lv denied 19 NY3d 816 [2012]). However, it is equally axiomatic that
“where the question is one of pure statutory reading and analysis, dependent only on accurate apprehension of legislative intent, there is little basis to rely on any special competence or expertise of the administrative agency ... In such circumstances, the judiciary need not accord any deference to the agency’s determination, and is free to ascertain the proper interpretation from the statutory language and legislative intent” (Matter of Belmonte v Snashall, 2 NY3d 560, 566 [2004] [internal quotation marks and citations omitted]; see Matter of Canales v Pinnacle Foods Group LLC, 117 AD3d 1271, 1272 [3d Dept 2014]; Matter of Rivera v North Cent. Bronx Hosp., 101 AD3d 1304, 1305 [3d Dept 2012]).
FOIL
Public Officers Law § 87 (2) states that “[e]ach agency shall, in accordance with its published rules, make available for public inspection and copying all records, except that such agency may deny access to records or portions thereof that” meet certain statutory exemptions listed in Public Officers Law § 87 (2) (a)-(n). “The premise of FOIL is ‘that the public is vested with an inherent right to know and that official secrecy is anathematic to our form of government’ ” (Matter of Newsday, Inc. v State Dept. of Transp., 5 NY3d 84, 88 [2005], cert dismissed 546 US 930 [2005], quoting Matter of Fink v Lefkowitz, 47 NY2d 567, 571 [1979]). As such, FOIL “mandates that ‘[e]ach agency shall . . . make available for public inspection and copying all records,’ unless the records fall within a statutory exemption” (Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale, 87 NY2d 410, 417 [1995], quoting Public Officers Law § 87 [2]). Stated otherwise, “[w]hile agency records are presumptively available for public inspection and disclosure under FOIL ... , an agency may deny access to records which” fall within one of the listed exemptions (Matter of Capital Newspapers Div. of Hearst Corp. v City of Albany, 63 AD3d 1336, 1337 [3d Dept 2009], affd as mod 15 NY3d 759 [2010]). Notably, “FOIL is to be liberally construed and its exemptions narrowly interpreted so that the public is granted maximum access to the records of government” (Matter of Capital Newspapers, Div. of Hearst Corp. v Whalen, 69 NY2d 246, 252 [1987]). While the party seeking an exemption bears *868 “the burden of establishing that the records fall squarely within an exemption by providing a particularized and specific justification, a proper procedure for meeting this burden is to submit the records in question for in camera inspection by the court” (Matter of Miller v New York State Dept. of Transp., 58 AD3d 981, 983-984 [3d Dept 2009] [citations omitted], lv denied 12 NY3d 712 [2009]).
Public Officers Law § 87 (2) (d)
The exemption at the heart of this proceeding, Public Officers Law § 87 (2) (d), provides that an agency may deny access to records or portions thereof that “are trade secrets or are submitted to an agency by a commercial enterprise or derived from information obtained from a commercial enterprise and which if disclosed would cause substantial injury to the competitive position of the subject enterprise.”
Preliminarily, the court cannot help but note the inelegance of the statutory language of this provision, and the lack of clarity in the statute as to whether a “trade secret,” without more, is exempt from disclosure, or whether it must also be shown, as respondents contend, that disclosure of the trade secret would “cause substantial injury to the competitive position of the subject enterprise” in order to be protected from disclosure (see respondents’ mem of law at 9, 11-15, 17; see also Brodsky group mem of law at 10-12). Petitioner disagrees and avers that the inquiry under Public Officers Law § 87 (2) (d) ends once the record at issue is found to constitute a “trade secret” (see petitioner’s mem of law at 10-11, 14-16; petitioner’s reply mem of law at 14-20).
In this court’s view, the latter argument is more persuasive and finds support in the legislative history of the 1990 amendment to Public Officers Law § 87 (2) (d) and in the relevant case law (see L 1990, ch 289, § 1). At the outset, the statute clearly delineates three types of information to be protected: (1) “trade secrets”; (2) records “submitted to an agency by a commercial enterprise”; and (3) records “derived from information obtained from a commercial enterprise” (Public Officers Law § 87 [2] [d]). Of these three, only the “trade secrets” phrase delineates a discrete, stand-alone category deserving of protection from disclosure. Indeed, the latter two categories of records, by themselves, hardly raise the prospect that such records contain confidential commercial information and, literally, could apply to anything an agency receives or discovers in the course of its everyday regulatory business. Only when these two types of rec *869 ords are connected by the term “and” to the prong “which if disclosed would cause substantial injury to the competitive position of the subject enterprise” are these two categories infused with the potential nondisclosure protection the exemption affords. By contrast, disclosure of a trade secret would seem, by its very nature, to adversely impact the entity seeking the protections of the exemption and thus render compliance with the second prong—proving that disclosure “would cause substantial injury to the competitive position of the subject enterprise”—an unnecessary and overly burdensome requirement.
Legislative History
A review of the legislative history of this statutory provision confirms this interpretation. Prior to 1990, Public Officers Law § 87 (2) (d) exempted from disclosure records, or portions thereof, that “are trade secrets or are maintained for the regulation of commercial enterprise which if disclosed would cause substantial injury to the competitive position of the subject enterprise” (Public Officers Law § 87 [former (2) (d)]). Thus, the original statutory language envisioned two distinct types of records that could be exempt from disclosure: (1) “trade secrets” or (2) records “maintained for the regulation of a commercial enterprise which if disclosed would cause substantial injury to the competitive position of the subject enterprise” (L 1977, ch 933, § 1). The plain language of the original statute, particularly the use of the term “or,” shows that records deemed to be trade secrets were absolved from the separate requirement to show how disclosure would cause substantial injury to the subject entity, which applied only to commercial information maintained by an agency for regulatory purposes.[11]
In 1990, Public Officers Law § 87 (2) (d) was amended as follows:
“are trade secrets or are malnt-a-i-ned for tho-regulation of submitted to an agency by a commercial enterprise or derived from information obtained from a commercial enterprise and which if disclosed would cause substantial injury to the competitive position of the subject enterprise” (L 1990, ch 289, *870 § 1 [former language crossed out; new language underscored]).
The legislative history of the 1990 amendment makes clear that the focus of the bill was expanding the ambit of records that may fall within the confidential commercial information exemption, not subjecting “trade secrets” to an additional evidentiary obligation.
Significantly, the bill underlying the 1990 amendment of Public Officers Law § 87 (2) (d) was introduced at the request of the New York State Department of Economic Development (DED). In its memorandum of support, DED stated as follows:
“Purpose of Bill:
“To amend the Public Officers Law in relation to modifying the confidential commercial information exemption of [FOIL]
“Summary of Provisions of Bill:
“. . . Section 1 would broaden the exemption from disclosure to include records, which if disclosed would cause substantial injury to the competitive position of an enterprise, even where such records were not maintained by an agency for the purpose of regulating a commercial enterprise. The broaden [sic] exemption would only apply to records which were originally submitted to the agency by the commercial enterprise or records derived from information obtained from the commercial enterprise” (Mem of State Dept of Economic Dev, 1990 McKinney’s Session Laws of NY at 2411 [emphasis added]).[12]
As is plainly evident from the highlighted section, the amendment was not intended to modify the trade secrets exemption (see also Mem of Dept of Transp, Bill Jacket, L 1990, ch 289 at 11 [amendment relates “to modifying the confidential commercial information exemption” of FOIL]).
In a memorandum to the Counsel to the Governor, the DED’s Deputy Commissioner and Counsel wrote:
“This bill . . . would broaden the exemption from disclosure to include records, which if disclosed would cause substantial injury to the competitive *871 position of an enterprise, even where such records were not maintained by an agency for the purpose of regulating a commercial enterprise. The broadened exemption would apply to records which were originally submitted to the agency by the commercial enterprise or records derived from information obtained from the commercial enterprise. . . .
“ . . . This bill is needed so that commercially confidential records maintained by economic development agencies are not required to be disclosed to the public, to the detriment of the State’s economic development efforts and of the businesses submitting such records ....
“The problem with the existing provision is that, while information maintained for the regulation of commercial enterprise may be withheld under appropriate circumstances, information that does not constitute a trade secret and which is not maintained for the purpose of ‘regulation’ falls outside the scope of section 87 (2) (d). There is no rational basis for the law to distinguish between protecting confidential commercial information for regulatory purposes, and confidential commercial information for other purposes. In either such case, the law should protect a business from the deleterious consequences of disclosure of sensitive commercial information” (Ten-Day Bill Mem, Bill Jacket, L 1990, ch 289 at 18-19).
Other legislative memoranda within the bill jacket make reference to the stated goal of the amendment, namely, broadening the exemption from disclosure (see Mem of Dept of State, Bill Jacket, L 1990, ch 289 at 20; Mem of Dept of Labor, Bill Jacket, L 1990, ch 289 at 12).[13] Nowhere in the legislative history of this amendment is there any indication that, where a record is found to be a “trade secret,” the legislature intended to add another secondary evidentiary hurdle for the party seeking the exemption to clear. Moreover, given the statutory charge of the *872 DED (see Economic Development Law, art 4, § 100),[14] it is implausible that the agency would propose a statutory amendment to allow for disclosure of a business’s trade secrets only if such business also proves that disclosure would cause substantial injury to the business’s competitive position (see Ten-Day Bill Mem, Bill Jacket, L 1990, ch 289 at 19 [“bill would protect businesses that provide information to State agencies from the . . . release to the public of extremely sensitive information about their operations, that could jeopardize their competitive position in the market place”]).
Case Law
New York courts have long recognized “[t]he importance of trade secret protection and the resultant public benefit” (Matter of New York Tel. Co. v Public Serv. Commn., 56 NY2d 213, 219 [1982]; see Matter of Crain Communications v Hughes, 135 AD2d 351, 352 [1st Dept 1987], affd 74 NY2d 626 [1989]; Curtis v Complete Foam Insulation Corp., 116 AD2d 907, 909 [3d Dept 1986]; Adams v Rizzo, 13 Misc 3d 1235[A], 2006 NY Slip Op 52135[U] [Sup Ct, Onondaga County 2006]). Although the term “trade secret” is not defined under FOIL, “courts applying New York law generally follow Section 757 of the Restatement of Torts in determining whether information is entitled to protection as a trade secret” (Matter of Physicians Comm. for Responsible Medicine v Hogan, 29 Misc 3d 1220[A], 2010 NY Slip Op 51908[U], *12 [Sup Ct, Albany County 2010]; see Ashland Mgt. v Janien, 82 NY2d 395, 407 [1993]; Matter of New York Tel. Co. v Public Serv. Commn., 56 NY2d at 219 n 3; Delta Filter Corp. v Morin, 108 AD2d 991, 992 [3d Dept 1985]). The Restatement defines a trade secret as “any formula, pattern, device or compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it” (Restatement [First] of Torts § 757, Comment b [emphasis added]).[15]
“Whether information is a trade secret depends, in part, upon *873 the ease or difficulty with which the information could be acquired or duplicated by others” (Savannah Bank v Savings Bank of Fingerlakes, 261 AD2d 917, 918 [4th Dept 1999]). Thus, the rationale for not subjecting a trade secret to a further requirement of showing “substantial injury” to the commercial enterprise’s competitive position likely stems from the fact that the definition of the term already takes into account that such information took considerable effort and resources to develop, has real economic value to the business and gives the business an advantage over competitors who are unaware of it. Importantly, the Restatement does not require that the advantage be “substantial.”
It appears that no New York court has squarely addressed the particular statutory interpretation question that is presently before this court. However, where parties have sought the protection of the Public Officers Law § 87 (2) (d) exemption, it appears to be the more common practice for courts to have, based on the underlying arguments, either evaluated whether the information is a “trade secret” or, separately, whether the information submitted by a commercial enterprise would, if disclosed, cause “substantial injury” to its competitive position (see e.g. Matter of Sunset Energy Fleet v New York State Dept. of Envtl. Conservation, 285 AD2d 865, 867 [3d Dept 2001] [in affirming lower court finding that documents were not exempt from disclosure, court initially holds that worksheets are not trade secrets, and then separately addresses the commercial information part of the exemption, noting that while “the worksheets were compiled by a commercial enterprise, petitioner failed to demonstrate the likelihood of substantial competitive injury if the worksheets were disclosed”]; Matter of New York Regional Interconnect, Inc. v Oneida County Indus. Dev. Corp., 21 Misc 3d 1118[A], 2007 NY Slip Op 52567[U], *5-6 [Sup Ct, Oneida County 2007] [after rejecting petitioners’ first argument that information does not meet definition of a trade secret, court next addresses the “primary contention by petitioners,” whether disclosure of the records submitted by a commercial *874 enterprise “would cause substantial injury to the competitive position of the petitioners”]; Waste-Stream,, Inc. v St. Lawrence County Solid Waste Disposal Auth., 166 Misc 2d 6 [Sup Ct, St. Lawrence County 1995] [court analyzes the “trade secrets” prong separate and apart from the “cause substantial injury” prong, finding the former not proven and the latter inapplicable]). Moreover, evaluating trade secrets separately from other commercial information that if disclosed would cause “substantial injury” has garnered support in treatise form (see Vincent R. Fontana, Mun Liab L & Prac § 19.27 [2014] [Trade Secrets/Substantial Injury] (P.O.L. section [2] [D]): “(e)ven if the requested records do not qualify as trade secrets, they may qualify for the exception based on the ‘substantial competitive injury’ prong of the exemption”]).
Notably, the court’s research has not uncovered any judicial decision affirming an administrative determination, as here, which pronounced a record to be a trade secret, and then allowed disclosure of it on the ground that the party seeking the protection of the exemption failed to show a likelihood of substantial competitive injury. Once a document has been found to be a trade secret under Public Officers Law § 87 (2) (d), the analysis ends (see Matter of Newman v Dinallo, 22 Misc 3d 1134[A], 2009 NY Slip Op 50422[U] [Sup Ct, Nassau County 2009], affd 69 AD3d 636 [2d Dept 2010], lv denied 14 NY3d 708 [2010] [court finds information at issue exempt from disclosure as “trade secrets” and concludes analysis]; see also Public Citizen Health Research Group v Food & Drug Admin., 704 F2d 1280, 1286 [DC Cir 1983] [“(i)f the requested documents constitute ‘trade secrets,’ they are exempt from disclosure (under FOIA), and no further inquiry is necessary”]). These cases appear, to this court, to be consistent with the legislative intent of the amendment and with the legislative policy that trade secrets, by their very nature, should be protected from disclosure (see Matter of New York Tel. Co. v Public Serv. Commn., 56 NY2d at 219).
The court is unpersuaded by respondents’ argument that New York courts have applied a two-pronged test under Public Officers Law § 87 (2) (d) for determining whether trade secrets are exempt from disclosure. The entirety of their argument turns on their interpretation of Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale (87 NY2d 410 [1995]). A review of the decision indicates that trade secrets were not at issue in that case and, in fact, the words “trade secrets” do not even appear in the text of the decision. *875 Encore involved a FOIL request by a private bookstore located near a State University of New York campus for the university’s fall semester booklist. The university already had an on-campus bookstore operated by Barnes & Noble which had successfully bid to provide such a service following a bidding process overseen by Auxiliary Service Corporation of the State University of New York Agricultural and Technical College at Farmingdale (ASC), a not-for-profit corporation charged with providing certain auxiliary services to the university. ASC argued that the information sought by the off-campus private bookstore “is shielded by the exemption set forth in section 87 (2) (d), which provides that an agency may deny access to records that ‘are . . . derived from information obtained from a commercial enterprise and which if disclosed would cause substantial injury to the competitive position of the subject enterprise’ ” (Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale, 87 NY2d at 418-419 [ellipsis in original], quoting Public Officers Law § 87 [2] [d] ). The Court of Appeals then framed the issue before it as follows: “[i]t is undisputed that the booklist was compiled by and obtained from Barnes & Noble, a commercial enterprise. Consequently, the question before us is whether release of the information would cause ‘substantial injury to the competitive position’ of Barnes & Noble” (Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale, 87 NY2d at 419 [emphasis added]). The court’s analysis then focused, not on the potential disclosure of trade secrets under FOIL, but on whether the commercial information at issue—a list of textbooks that would be used by university students in the fall semester—if disclosed would create “the likelihood of substantial competitive injury to Barnes & Noble” (id. at 421). Thus, to the extent that respondents rely on Encore, and other decisions citing Encore, for the proposition that such decision establishes a two-part test for the release of trade secrets under FOIL, their argument is flawed.[16]
Finally, it is important to note that a similar exemption in FOIA exempts “trade secrets and commercial or financial information obtained from a person and privileged or confidential” *876 from disclosure (5 USC § 552 [b] [4]). Significantly, federal courts have not treated “trade secrets” in the same manner as “commercial or financial information” (see National Parks & Conservation Assn. v Morton, 498 F2d 765, 766 [DC Cir 1974] [“(i)n order to bring a matter (other than a trade secret) within this exemption, it must be shown that the information is (a) commercial or financial, (b) obtained from a person, and (c) privileged or confidential” (emphasis added)]). Notably, the term “confidential” for purposes of FOIA means that disclosure would be likely to, among other things, “ ‘cause substantial harm to the competitive position of the person from whom the information was obtained’ ” (Jurewicz v U.S. Dept. of Agriculture, 741 F3d 1326, 1331 [DC Cir 2014], quoting Critical Mass Energy Project v Nuclear Regulatory Commn., 975 F2d 871, 878 [DC Cir 1992]).
Turning to DPS’ own regulations, the court observes that DPS’ regulatory definition of “trade secret” is virtually identical to the Restatement (see 16 NYCRR 6-1.3 [a]; Restatement [First] of Torts § 757, Comment 6).[17] However, DPS’ implementing regulation goes considerably further and requires that “[i]n all cases” a person seeking the exemption from disclosure under Public Officers Law § 87 (2) (d) “must show the reasons why the information, if disclosed, would be likely to cause substantial injury to the competitive position of the subject commercial enterprise” (16 NYCRR 6-1.3 [b] [2]). As outlined above, this interpretation by DPS is not only wholly inconsistent with the legislative history of Public Officers Law § 87 (2) (d), which indicates that the “substantial injury” prong was not intended to apply to trade secrets, it is at variance with the Restatement discussion of “trade secret,” which does not require such a showing, and has little, if any, support in existing case law.[18] As the question before the court “is one of pure statutory reading *877 and analysis, dependent only on accurate apprehension of legislative intent” (Matter of Belmonte v Snashall, 2 NY3d at 566), the court is not obliged to afford the DPS interpretation of the exemption any deference.[19] Accordingly, the court finds, as a matter of law, that, to the extent petitioner proves a document is a trade secret under Public Officers Law § 87 (2) (d), the inquiry ends there and the record may not be disclosed.
The “Trade Secrets” Determinations as to the Cost Information and Certain M & P Information
The RAO found that “Verizon makes a valid case that [the cost information and part of the M & P information] fits within the definition of trade secret,” citing the DPS trade secret regulatory definition set forth at 16 NYCRR 6-1.3 (a) (affirmation in support, exhibit I at 12, 15 [“Verizon met the test for trade secret for Request 1 and the three M & P documents provided in response to Request 3”]). As for the cost information, the RAO stated that “[t]he information . . . consists of sensitive cost analysis for each type of network construction done by the [petitioner], more fully described by Verizon herein” (id. at 12). Regarding the M & P information, the RAO determined “it appears that documents (1), (2) and (10)” of the 331-page submission are M & P information that meets the trade secret definition, noting that “Verizon discusses several factors mentioned in the regulations, including the degree of difficulty and cost of developing the information” (id.). The RAO concluded, however, that “ [although Verizon met the test for trade secret for Request 1 and the three M & P documents provided in response to Request 3, it did not carry its burden of proof with respect to competitive injury” and “failed to satisfy the second prong of the Encore test” (id. at 13, 15).
The Secretary upheld the RAO’s November 4, 2013 determination in its entirety (see id., exhibit Q at 20). She similarly found that petitioner “makes ... a valid case” that certain cost information provided “relating to network costs, might fit *878 within the [DPS] definition of a trade secret,” and noted that petitioner had submitted “two declarations in support of its position that present more compelling facts and stronger arguments that Verizon has met the burden of proof’ under Public Officers Law § 89 (5) (e) (id. at 13). The Secretary also agreed with the RAO that documents (1), (2) and (10) of the M & P information submission were methods and procedures justifying protection as trade secret material (id. at 15). The Secretary then concluded that petitioner “has failed to demonstrate that all of the cost information, both aggregate and specific, contained within the documents would result in substantial competitive injury if disclosed through the instant FOIL request” (id. at 13-14) and, with respect to the M & P information, “failed to demonstrate, in adequate detail, how the complete disclosure of all 13 documents would result in substantial competitive injury” (id. at 16).
The court finds, based upon its foregoing statutory analysis and interpretation, that the Secretary (as well as the RAO) erred as a matter of law by subjecting information determined to be “trade secrets” to further review under the “substantial injury” prong of the statute. In light of the legislative history of Public Officers Law § 87 (2) (d) and the relevant case law applying this provision, the court finds that, once respondents concluded that the cost information and part of the M & P information constituted trade secret material, the inquiry should have ended; no proof of “substantial competitive injury” was required by the statute, and the material should have been determined to be exempt from disclosure under FOIL.
The Cost Information
The court has reviewed in camera the eight pages of cost information that was deemed by respondents to be trade secrets {see confidential submission, exhibit H [1] at 1-8), and concludes that this finding by respondents was rational and neither arbitrary and capricious, nor an abuse of discretion.
As discussed above, the term “trade secret” means “any . . . compilation of information which is used in one’s business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it” (Restatement [First] of Torts § 757, Comment b; see also 16 NYCRR 6-1.3 [a] [DPS regulation defining trade secret]). Notably, the costs a company incurs in operating its business may be trade secrets under FOIL (see Matter of City of Schenectady v O’Keeffe, 50 AD3d 1384, 1386 [3d Dept 2008], lv denied 11 NY3d 702 [2008] [affirming lower court finding that agency did not “abuse its *879 discretion in according trade secret status to the data in question” where data included “detailed inventory of the age, cost and extent of the property” used by utility to determine, in part, the regulated rate that utility could charge for its services, and was a “costly and complex endeavor” to compile, with “self-evident value” to a competitor that would “complicate, if not compromise, (the utility’s) competitive position”]). Pricing and budgetary information may also be shielded from disclosure (see Matter of Catapult Learning, LLC v New York City Dept. of Educ., 109 AD3d 731, 732 [1st Dept 2013] [information “about pricing, budget, and insurance” submitted in a contract proposal to an agency and requested by a nonparty under FOIL properly exempted where disclosure would reveal “essential information about (petitioner’s) previously successful approach to bidding for educational services contracts”]; see also Matter of New York State Elec. & Gas Corp. v New York State Energy Planning Bd., 221 AD2d 121 [3d Dept 1996] [operational data that could result in competitors “inferring essential aspects of (power producer’s) production costs fundamental to projecting future costs” properly withheld], lv granted 89 NY2d 803 [1996], appeal withdrawn 89 NY2d 1031 [1997]).[20]
The cost information at issue here consists of eight pages of costs and revenue estimates prepared by petitioner and arising from its construction and/or replacement of communication networks on Fire Island. The data includes: (1) assumptions underlying the cost studies; (2) figures related to the specific costs of installation of the wireless distributed antennae system, including construction costs and details of the physical installation; (3) specific costs of various components for installation of WL, including costs of the WL devices themselves and the *880 costs of copper loops to certain municipalities; (4) detailed costs for construction of a wireline DLC service network, including the costs of individual components like labor and trenching costs, and the specific materials costs (and quantities needed) of cable and copper for exchanging existing cable; and (5) detailed costs related to construction and installation of an FTTP network on Fire Island, including labor, equipment, materials and vendor contract costs, as well as the costs of reconnecting customers. Both the Taylor and Wheatley declarations satisfactorily address how the cost information is used in the petitioner’s business, how it gives petitioner an advantage over its competitors and how disclosure of these costs would assist competitors seeking to cut into petitioner’s market share (see affirmation in support, exhibit J ¶¶ 8-9, 11-13; exhibit K ¶¶ 3, 6). The Taylor declaration, in particular, provides a reasonable assessment of the advantages competitors would gain if the cost information was disclosed, including the value of such cost data to four specific competitors in petitioner’s industry and the impact on petitioner’s ability to negotiate prices (and price discounts) for material purchased in procurement processes (see id., exhibit J ¶¶ 13-15). Further, both declarations demonstrate that the cost information is not information that petitioner would publicly disclose, as it provides detailed costs for implementing three specific proprietary technologies (see id., exhibit K ¶ 3; exhibit J ¶¶ 6-7).
Based upon its review, the court finds no basis to disturb the finding by the Secretary (and RAO) that petitioner made a “valid case” for trade secret protection of the eight pages of cost information under FOIL.[21] Thus, the eight pages of cost information are exempt from disclosure pursuant to Public Officers Law § 87 (2) (d).
*881 The M & P Information—Documents (1), (2) and (10)
The court has also reviewed in camera the portions of the M & P information deemed by the RAO and the Secretary to be trade secret materials (see confidential submission, exhibit H [3] at 10-44 [document No. 1], 46-165 [document No. 2], 268-319 [document No. 10]), and similarly finds no basis to reject such findings.
The RAO found that these three filings “meet th[e trade secret] description,” noting that petitioner raised “several factors mentioned in the regulations” including “the degree of difficulty and cost of developing the information” (affirmation in support, exhibit I at 12; see also Restatement [First] of Torts § 757, Comment b [factors in “determining whether given information is one’s trade secret (include) the amount of effort or money expended by him in developing the information”]). The Secretary concurred that filings (1), (2) and (10) are trade secret material (see id., exhibit Q at 15). Collectively, these three documents, which identify themselves as M & Ps (see confidential submission, exhibit H [3] at 14-15, 31 [document No. 1], 48 [document No. 2] [“This document provides a comprehensive method and procedure”], 268 [document No. 10]), contain detailed descriptions of petitioner’s comprehensive business strategy for establishing WL, a new wireless service. The information includes (1) decisional paths and scripts for Verizon employees to follow related to offering WL; (2) detailed training materials that set forth specific scenarios that may arise when Verizon employees interact with or advise current and potential WL subscribers; and (3) itemized instructions on issues related to wireline services. The MacNabb declaration estimates that the process of developing all the WL M & P information “took months” and “at least 11,900 hours of work” (affirmation in support, exhibit L ¶¶ 8-9).
Based on its review, the court finds no basis to reject the Secretary’s appeal determination affirming the RAO’s holding that documents (1), (2) and (10) of the M & P information were methods and procedures that constituted trade secret materials. These documents, therefore, are exempt from disclosure pursuant to Public Officers Law § 87 (2) (d).
*882 The M & P Information—Documents (3) through (9) and (11) through (13)
The court turns now to the 10 remaining documents and petitioner’s argument that respondents’ finding, that such documents were not trade secret materials, was based upon an error of law and was arbitrary and capricious. To this end, the court has conducted an in camera review of the remaining documents identified by petitioner as M & P information.
In the appeal determination, the Secretary rejected the argument that all 13 documents “are entitled to sweeping protection as trade secret material” {id., exhibit Q at 15). The Secretary stated that
“[w]hile it is clear that Verizon has spent a considerable amount of time developing its methods and procedures, the Company has failed to proffer any specific evidence that the disclosure of these 13 documents will—or would be likely to—cause it competitive injury. As such, I find that Verizon has failed to meet its burden of justifying the exemption of all 13 documents as trade secret materials” (id. at 17).
Following its in camera review, the court agrees, in part, with petitioner. The court finds the Secretary’s determination that documents (3) through (8) and (11) were not trade secret materials to be arbitrary and capricious. As for documents (9), (12) and (13), the court finds no reason to disturb the Secretary’s finding that those documents did not constitute trade secret materials.
When examined under the DPS regulatory definition of trade secret, which tracks the Restatement definition, it is difficult to reconcile how documents (1), (2) and (10) can be deemed by respondents as methods and procedures deserving of trade secret status, and documents (3) through (8) and (11) not be accorded such stature. While documents (3) through (8) and (11) may not be expressly labeled “methods and procedures,” any programmatic or subject matter differences between these filings and documents (1), (2) and (10) are slight, and the court can detect no discernible, substantive differences between documents (1), (2) and (10) and documents (3) through (8) and (11).
Like documents (1), (2) and (10), documents (3) through (8) and (11) are comprised of detailed scripts, instructions and talking points for use by Verizon employees and are designed to promote the sale of WL to customers nationally as well as to existing customers in New York and New Jersey impacted by Hurricane Sandy. The scripts are internal processes that set out the various paths and procedures to follow depending on the *883 customer’s specific needs and interest (or disinterest) in WL, and cover topics that customers may have related to installation, billing, repairs, costs and copper lines (confidential submission, exhibit H [3] at 167-182 [document No. 3], 184-250 [document No. 4], 252 [document No. 5], 254-256 [document No. 6], 258-260 [document No. 7], 262-263 [document No. 8], 321-335 [document No. 11]). This information is not comprised of documents that were readily ascertainable from sources outside petitioner’s business (compare Schriptek Mktg. v Columbus Mc-Kinnon Corp., 187 AD2d 800, 802-803 [3d Dept 1992], lv denied 81 NY2d 704 [1993]). As the MacNabb declaration noted, these “detailed processes, procedures and guidance . . . concern[ ] how to interact with customers before, during, and after their ordering of the service . . . Verizon’s competitors would have no way of obtaining complete and detailed knowledge of Verizon’s methods and procedures unless they were given access to the documents at issue here” (affirmation in support, exhibit L ¶ 10). Further, as the Secretary herself expressly acknowledges, and the MacNabb declaration points out, documents (3) through (8) and (11), like documents (1), (2) and (10), took considerable time and effort for petitioner to develop (see Restatement [First] of Torts § 757, Comment 6; see also Takata v Hartford Comprehensive Empl. Benefit Serv. Co., 283 FRD 617, 621-622 [ED Wash 2012]).[22]
In addition, petitioner’s argument that these other documents are trade secret materials is supported by petitioner’s efforts to keep these internal processes for interacting with customers about WL secret (compare Sales Strategies Group, Inc. v Fenton, 16 Misc 3d 171, 173 [Sup Ct, Monroe County 2007]). The filings were not shared outside the company and only distributed internally with directions to keep the materials confidential. Specifically, the majority of these documents contained language like “Confidential and Proprietary to Verizon—Not for use or disclosure outside Verizon Communication or any of its subsidiaries except under written agreement” (see confidential submission, exhibit H [3] at 258 [document No. 7], 262 [document No. 8]), or the phrase “[u]se, disclosure or distribution of this mate *884 rial is not permitted to any unauthorized persons or third parties except by written agreement” (id. at 167-182 [document No. 3], 184-250 [document No. 4], 252 [document No. 5]).
Given the near complete absence of any difference between the content in documents (1), (2) and (10)—which was accorded trade secret status—and the content in documents (3) through (8) and (11)—which was denied trade secret protection—the court finds that respondents’ determination that documents (3) through (8) and (11) were not trade secret materials to be arbitrary and capricious. The court holds that, as trade secrets, these seven other documents are exempt from disclosure pursuant to Public Officers Law § 87 (2) (d).
The court finds no basis, however, to overturn respondents’ findings that documents (9), (12) and (13) are not exempt from disclosure pursuant to Public Officers Law § 87 (2) (d). Document (9), which is titled “Notification,” is a general bulletin about WL and its use in the New Jersey Barrier Islands and in New York for storm impacted customers (see id. at 265). Documents (12) and (13) are emails to Verizon staff about WL (see id. at 337 [document No. 12], 339 [document No. 13]). None of these three documents contain language urging confidentiality and nondisclosure, and there is no support in the record for according these documents protection from disclosure pursuant to Public Officers Law § 87 (2) (d).
Accordingly, it is hereby ordered and adjudged that the petition is granted in part and denied in part, as provided herein, without costs. Specifically, the court holds as follows: (1) that the eight pages of cost information {see confidential submission, exhibit H [3] at 1-8) are exempt from disclosure under Public Officers Law § 87 (2) (d); (2) that documents (1), (2), (3), (4), (5), (6), (7), (8), (10) and (11) of the M & P information (see id. at 10-44 [document No. 1], 46-60 and lower half of page 65-165 [document No. 2], 168-182 [document No. 3], 185-223 and 225-250 [document No. 4], 252 [document No. 5], 254-256 [document No. 6], 258-260 [document No. 7], 262-263 [document No. 8], 268-319 [document No. 10], and 321-335 [document No. 11]) are exempt from disclosure under Public Officers Law § 87 (2) (d); and (3) that documents (9), (12) and (13) of the M & P information (see id. at 265-266 [document No. 9], 337 [document No. 12], and 339 [document No. 13]) are not exempt from disclosure under Public Officers Law § 87 (2) (d) and shall be released by respondents.

. Petitioner also filed the documents at issue in this proceeding for the court’s in camera review. The in camera submission has two exhibits and 339 pages, is consecutively paginated using Bates stamp numbers, and will be referred to herein as “confidential submission.” The page numbers referenced by the court are the Bates stamp page numbers.

. The court denied the motion inasmuch as it sought an order permitting the Brodsky group to intervene in this proceeding. The Brodsky group filed a brief on February 27, 2014, which the court agreed to consider after granting its request to appear as amici curiae.

. The court received a stenographic transcript of the oral argument on May 7, 2014.

. The records were submitted in Tariff Filing by Verizon N.Y. Inc. to Introduce Language Under Which Verizon Could Discontinue its Current Wire-line Serv. Offerings in a Specified Area & Instead Offer a Wireless Serv. as its Sole Serv. Offering in the Area (NY PSC Case No. 13-C-0197).

. Fire Island is a barrier island located off the southern shore of Long Island. Following Hurricane Sandy in October 2012, petitioner’s facilities and infrastructure on Long Island were damaged. Rather than replacing the dam *862 aged facilities and lines, petitioner proposed to offer WL as its principal service option on Fire Island.

. Public Officers Law § 89 (5) sets out the procedure to be followed where, as here, an entity requests that a state agency except from disclosure, pursuant to Public Officers Law § 87 (2), information submitted to the state agency by the entity.

. As the Brodsky group clarifies in its brief, its reference in the comments to the federal Freedom of Information Act (FOIÁ) was an error, and it intended to cite FOIL rather than FOIA.

. In their determinations, respondents stated that the M & P information consisted of 330 pages (see affirmation in support, exhibit I at 12; exhibit Q at 5). However, the materials submitted to the court for its in camera review contain 331 pages of M & P information, and petitioner states in its memorandum of law that there are 331 pages of M & P information.

. Petitioner has withdrawn its request for confidential status of nearly five pages of the M & P information, representing a WL user guide which is a publicly-available document, and has un-redacted those pages (see verified petition ¶ 32 n 11; see also confidential submission, exhibit H [3] at 61-65).

. The RAO observed that “[i]t is only with more compelling facts (perhaps submitted in an affidavit by an economist or other expert) and stronger arguments that [petitioner] can meet the burden of proof it bears pursuant to [Public Officers Law] § 89 (5) (e)” (affirmation in support, exhibit I at 13-14). Petitioner subsequently submitted three declarations in its appeal (see id., exhibits J, K, L).

. The bill jacket for the 1977 revision of article 6 of the Public Officers Law makes scant reference to the “trade secrets” exemption and, when it is discussed, there is no mention that records deemed “trade secrets” must also cause substantial injury to the enterprise’s competitive position to receive the protection of the exemption (see Bill Jacket, L 1977, ch 933).

. The bill jacket for the 1990 amendment also manifests an intent to track 5 USC § 552 (b) (4), a parallel exemption in FOIA (see Mem of State Dept of Economic Dev, 1990 McKinney’s Session Laws of NY at 2412). Notably, it has been held that New York courts can look to FOIA for guidance in interpreting FOIL (see Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale, 87 NY2d at 419).

. The Court of Appeals has also commented on the 1990 amendment and noted the stated goal of broadening the exemption for confidential commercial information: “Prior to 1990, FOIL exemption subdivision (2) (d) was expressly limited to information maintained for purposes of regulation which, if disclosed, would cause substantial competitive injury. The 1990 amendment broadened the exemption by eliminating the condition that the confidential commercial information be for regulatory purposes” (Matter of Encore Coll. Bookstores v Auxiliary Serv. Corp. of State Univ. of N.Y. at Farmingdale, 87 NY2d at 419 n).

. “The [DED] commissioner acting by and through the department of economic development shall have power and it shall be his duty ... to investigate, study and undertake ways and means of promoting and encouraging the prosperous development and protection of the legitimate interest and welfare of New York business, industry and commerce, within and outside the state” (Economic Development Law, art 4, § 100 [1] [emphasis added]).

. While noting that by its very nature “[t]he subject matter of a trade secret must be secret” and acknowledging that “[a]n exact definition of a trade secret is not possible,” the Restatement sets forth factors to consider in determining whether a trade secret exists:
*873 “(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others” (Restatement [First] of Torts § 757, Comment b).

. Respondents’ reliance on Matter of Markowitz v Serio (11 NY3d 43 [2008]) to support their trade secrets argument is similarly misplaced. Markowitz involved a FOIL request for commercial information—specifically, zip code information pertaining to automobile insurance policies—submitted by automobile insurers to the State Insurance Department. Trade secrets were not at issue in that case.

. There is only one non-substantive difference between the definitions set forth in the DPS regulation and the Restatement. Instead of the Restatement’s phrase “and which gives him an opportunity,” the DPS regulation states “and which provides an opportunity” (16 NYCRR 6-1.3 [a] [emphasis added]).

. DPS’ regulation also differs from the implementing regulations of other agencies with respect to FOIL. For example, the definition of “trade secret” under the Department of Environmental Conservation’s FOIL regulations contains no “substantial injury” requirement (6 NYCRR 616.7 [c] [2] [i] [a]). Conversely, its definition of “confidential commercial information” means other types of information “which if disclosed would likely cause substantial injury to the competitive position of the subject enterprise” (6 NYCRR 616.7 *877 [c] [2] [i] [b]; see also 9 NYCRR 2650.9 [b] [3] [iii] [Division of Housing and Community Renewal FOIL regulations require parties seeking FOIL exemption to “state reasons why the information is either a trade secret or confidential commercial information likely to cause substantial competitive injury” (emphasis added)]).

. Implementation of FOIL, which is codified in the Public Officers Law, is not particular to one agency, and DPS alone is not expressly charged with the task to enforce FOIL; all state and municipal departments are charged with promulgating rules and regulations related to the availability of records and procedures to be followed (see Public Officers Law §§ 84; 87 [1] [b]).

. In support of its position, petitioner has submitted copies of rulings of DPS administrative law judges which have accorded trade secret status to cost information submitted during the course of a regulatory proceeding (see e.g. affirmation, exhibit G [7], Ruling on Proprietary Status of Module 3 Testimony and Exhibits, NY PSC Case No. 98-C-1357 at 2 [Jan. 31, 2002] [pricing data, pricing information and invoice information related to company’s dealings with its equipment vendors and use of costing models falls within DPS trade secret regulation, is not widely available, difficult to obtain or costly to develop, and would be of substantial use to competitors]; exhibit G [5], Ruling Concerning Proprietary Status of Exhibit 106-P, NY PSC Case No. 98-C-1357 at 1-2 [Apr. 17, 2000] [detailed cost study for components of a highly competitive retail service accorded protection as a trade secret under FOIL]; exhibit G [9], Ruling on Confidential Trade Secret Status of Testimony and Exhibits, NY PSC Case No. 02-C-1425 [Oct. 8, 2004] [cost information related to labor rates and overhead given trade secret protection]).

. The court is not persuaded by the “granular costs” and “aggregate costs” argument raised by respondents insofar as the trade secret findings are concerned. The Secretary explicitly affirmed the RAO’s determination (see affirmation, exhibit Q at 20), which expressly stated that petitioner “makes a valid case” that the cost information—all eight pages—“fits within the definition of trade secret” (id., exhibit I at 12). Furthermore, respondents cite no statutory or regulatory definition of the terms and the court could find no judicial decision (and the Secretary does not cite any) drawing a distinction between “granular” and “aggregate” costs for trade secret analysis purposes under FOIL. Finally, respondents’ reliance on Gray v Faculty-Student Assn. of Hudson Val. Community Coll. (186 Misc 2d 404 [Sup Ct, Rensselaer County] [2000]) for the proposition that cost data like the cost information at issue here can be partially redacted is not persuasive. As petitioner points out, unlike the record in this case, in Gray there was no credible evidentiary support *881 before that court as to the impact of disclosing redacted invoices (see affirmation in further support ¶¶ 6-9).

. It also bears mention that an alternative basis exists for exempting document (4) from disclosure. Document (4) is a detailed internal training guide or manual for Verizon supervisors regarding WL market introduction and includes scripts for interacting with existing and new customers (confidential submission, exhibit H [3] at 184-205). This type of guide meets the criteria of a trade secret (see Ain Leasing Corp. v Peat, Marwick, Mitchell & Co., 166 Misc 2d 902, 904 [Sup Ct, Nassau County 1995]).